IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Deborah A. Simmons,                    )
                                       )    Civil Action No. 6:06-0428-CMC-WMC
                    Plaintiff,         )
                                       )    **REPORT OF MAGISTRATE JUDGE**
          vs.                          )
                                       )
Jo Anne B. Barnhart,                   )
Commissioner of Social Security,       )
                                       )
                    Defendant.         )
_____)

          This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

          The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits (DIB) and supplemental security income (SSI) benefits under Titles II and XVI of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

          The plaintiff filed an application for SSI on May 27, 1986, alleging disability on that date.  This application was denied initially and no further action was taken by the plaintiff.  The plaintiff also filed applications for DIB and SSI on November 29, 2001,

_____

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

alleging disability beginning August 8, 2001. These applications were both denied initially and no further action was taken.

The plaintiff filed her current applications for DIB and SSI benefits on July 7, 2003, respectively, alleging that she became unable to work on May 29, 2003. The applications were denied initially and on reconsideration by the Social Security Administration. On July 6, 2004, the plaintiff requested a hearing. The administrative law judge, before whom the plaintiff and her attorney appeared, considered the case *de novo*, and on November 18, 2005, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on February 10, 2006. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

(1)    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Art and is insured for benefits through the date of this decision.

(2)    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

(3)    The claimant's ... obesity, degenerative joint disease and osteoarthritis are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

(4)    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

(5)    The claimant has the residual functional capacity for light work, or work which involves occasionally lifting and/or carrying a maximum of 20 pounds; frequently lifting and/or carrying up to 10 pounds; and walking or standing six hours a day, or which requires sitting most of the time, but entailing pushing and/or pulling of arm and/or leg controls.

(6)    The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

(7)    The claimant is a "younger individual between the ages of 18 and 44" (20 CFR §§ 404.1563 and 416.963).

(8)    The claimant has a "high school (or high school equivalent) education" (20 CFR §§ 404.1564 and 416.964).

(9)    The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

(10)    The claimant has the residual functional capacity to perform the full range of light work (20 CFR §§ 404.1567 and 416.967).

(11)    Based on an exertional capacity for light work, and the claimant's age, education, and work experience, a finding of "not disabled" is directed by Medical-Vocational Rules 202.20 and 202.21.

(12)    The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(13)    The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.


## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

3

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389

4

(1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 44 years old at the time of the ALJ's decision and has a high school education.  She has past relevant work as a certified nursing assistant, mental health specialist, cashier, work adjustment mental retardation aide and childcare worker.  She alleges that she became disabled on May 29, 2003, due to transient ischemic accident, pancreatitis, arthritis of the back and hips, back and hip pain, leg swelling, high blood pressure, anxiety attacks, shortness of breath, carpal tunnel syndrome and obesity.

In April 2001, several years prior to the plaintiff's alleged onset, she presented to the emergency room (ER) with chest pain and was diagnosed with atypical, noncardiac chest pain and treated with medication (Tr. 156-67).  In August 2001, the plaintiff was hospitalized after complaints of chest pain.  Cardiac enzymes were negative.  A heart

5

catheterization was essentially normal with only mild hypertension (Tr. 168-83). The plaintiff had two other ER visits in August 2001 and September 2001 with complaints of chest pain. She was diagnosed with atypical chest pain, noncardiac; and possible gastroesophageal reflux disease or gastritis (Tr. 184-202).

Treatment notes from the Free Medical Clinic from September 2001 through December 2001 show treatment for blood pressure in the form of medication (Tr. 203-07).

In December 2001, the plaintiff was seen by Dr. David B. Fulton at the Moore Orthopedic Clinic for complaints of pain and numbness of her left hand. Dr. Fulton recommended a nerve conduction study and diagnosed probable left carpal tunnel syndrome (Tr. 208-09).

As part of her second application for disability, the plaintiff underwent a consultative examination in February 2002 with Dr. Mitchell H. Hegquist. Dr. Hegquist diagnosed gastroesophageal reflux disease, controlled; hypertension, controlled; status-post one episode of chest pain in August 2001 with normal heart catheterization; moderate to marked overweight; asthma currently well controlled; history of right carpal tunnel syndrome; left carpal tunnel syndrome status-post surgical intervention; and complaints of low back, bilateral hip and left knee pain (Tr. 210-15).

The plaintiff presented to the ER in August 2002 for a sore throat (Tr. 216-23). In August 2002, she plaintiff underwent an elective, outpatient scoping procedure for difficulty swallowing. All findings were normal (Tr. 224-37).

In September 2002, the plaintiff went to the ER with complaints of aching all over. She was diagnosed with generalized aches and a viral syndrome, and treated with medication (Tr. 238-46). In November 2002, the plaintiff presented to the ER with complaints of cough, cold, congestion and sore throat. She was given Motrin, Tylenol and ginger ale, and discharged home (Tr. 247-59).

6

In June 2003, the plaintiff underwent an elective outpatient colonoscopy. A non-cancerous polyp was removed (Tr. 265-80).

Records from the ER at the Lexington Medical Center indicate that the plaintiff was seen in February 2003 with chest pain. An EKG and chest X-ray were essentially normal. She was diagnosed with acute atypical chest pain and elevated blood pressure, and was treated with medication and discharged home. In March 2003, the plaintiff was treated at the ER for a urinary tract infection and elevated blood pressure. In May 2003, she was treated at the ER for a headache and hypertension. It was noted that the plaintiff had not taken her blood pressure medication in months. A head CT scan was negative. An echocardiogram showed only very mild mitral insufficiency, but was otherwise normal. A carotid duplex scan was normal (Tr. 287-305).

In May 2003, the same month as her alleged disability onset date, the plaintiff presented to the ER with left-sided weakness and abdominal discomfort. A head CT scan and chest X-ray were negative. The plaintiff's neurological symptoms resolved. She was diagnosed with acute transient ischemic attack (TIA) and discharged home. Two days later, the plaintiff again presented to the ER with abdominal discomfort. The plaintiff did not indicate any further left-sided weakness. Later in May 2003, the plaintiff presented to the ER with chest and back pain. All tests, including EKG, chest CT scan, chest X-ray and laboratory panels, were essentially normal. The plaintiff was diagnosed with substernal chest pain and upper abdominal pain of uncertain etiology, given a prescription and discharged home (Tr. 282-86).

On June 5, 2003, the plaintiff underwent a colonoscopy. On June 6, 2003, she presented to the ER with rectal bleeding. The emergency room physician spoke to the physician who had done the colonoscopy, who indicated that the procedure had gone well. The plaintiff was diagnosed with hemorrhoids and abdominal pain and was discharged (Tr. 281-305).

7

In July 2003, the plaintiff was hospitalized after complaints of chest pain. All testing, including a stress Myoview study, chest x-ray, laboratory panels and EKG, was essentially negative for any cardiac event. She was discharged with diagnoses of atypical chest pain, hypertension and mild hypokalemia (Tr. 306-23).

In August 2003, the plaintiff presented to the emergency room with complaints of chest pain. Testing was again negative. The plaintiff was told that she may have obstructive sleep apnea and was told to follow up with her primary care physician (Tr. 324-35).

The record shows treatment with Dr. Nguyen D. Thieu from September 2001 through August 2003. These few treatment notes show diagnoses including degenerative joint disease, hypertension and anxiety; and treatment limited to medication (Tr. 336-41).

In September 2003, the plaintiff was seen by Dr. Jairaj Prashad and diagnosed with obstructive sleep apnea, obesity, hypertension, asthma and hoarseness, probably secondary to chronic sinusitis. Dr. Prashad indicated that the plaintiff should undergo a sleep study and try to lose weight. He prescribed medication (Tr. 342-47).

As part of this application for disability, the plaintiff underwent a consultative examination in March 2004 with Dr. Mitchell H. Hegquist. The plaintiff reported that she was diagnosed with hypertension approximately two years prior, that she was followed by her primary care physician, that she took Maxzide and Tarka daily, and had not had any complications from hypertension. The plaintiff reported complaints of pain in her lower back, hips and left knee. She stated that had been evaluated by her family physicians and told to lose weight and use over-the-counter non-steroid anti-inflammatory drugs (NSAIDS). The plaintiff indicated that she underwent left wrist surgery for carpal tunnel syndrome approximately 18 months prior, with a return of pain and numbness in her fingers. She reported mild carpal tunnel syndrome of her right hand, which was evaluated and determined not to need surgical intervention. The plaintiff reported a mini-stroke in 2003,

8

with symptoms resolving in 15-20 minutes and with no subsequent evaluation or treatment. Although the plaintiff complained of wrist tenderness, grip strength was normal and she was able to perform fine and gross manipulations. The plaintiff had no motor or sensory deficits. Range of motion was rated as normal with all joints. Lumbar spine and right hip x-rays were essentially normal. Left knee x-rays showed evidence of degenerative changes. Mental status examination was normal (Tr. 348-52).

The plaintiff underwent a psychiatric evaluation in June 2004 with Dr. Bonnie J. Ramsey. The plaintiff reported good appetite, no problems with her concentration, poor energy, and anxiety symptoms which did not keep her from leaving home. She reported activities of daily living of independence with self-care, preparing food, reading, watching television, walking around outside the house, some cleaning, some grocery shopping, receiving visitors and attending church weekly. Dr. Ramsey diagnosed the plaintiff with anxiety disorder, but indicated that the plaintiff had not allowed her anxiety attacks to limit her ability to function (Tr. 353-56).

In May 2004, the plaintiff was hospitalized after complaints of chest pain and shortness of breath. All cardiac testing, including serial electrocardiograms and cardiac enzymes, were negative. The plaintiff was diagnosed with atypical chest pain, hypertension, obesity, obstructive sleep apnea and hyperlipidemia and discharged to home (Tr. 408-33).

In June 2004, the plaintiff was hospitalized after complaints of nausea and chest pain. Cardiac testing was again negative. She was diagnosed with atypical chest pain, stable for out-patient management; acute bronchitis; nausea and vomiting, resolved; hypertension; and obstructive sleep apnea (Tr. 434-60).

In July 2004, the plaintiff presented to the emergency room and was subsequently hospitalized for a possible cerebral vascular accident after complaints including chest pain, right-sided weakness, trouble swallowing, a slight headache and blurry

9

vision.  Cardiac enzymes were negative times three.  An EKG showed no changes from previous studies.  The spiral CT was normal.  The MRI of the head showed no evidence of stenosis or major branch occlusions.  The MRI of the brain was normal.  The plaintiff's condition improved during her hospitalization.   Neurology was consulted and it was determined that the plaintiff's symptoms were not representative of an ischemic event, and that the plaintiff's symptoms were more likely psychogenic (produced or caused by psychic or mental factors rather than organic factors).  The plaintiff had no episodes of chest pain or hypertension while hospitalized.  Although the plaintiff complained of leg pain, Doppler studies of the legs were negative (Tr. 461-67).  Subsequent to this hospitalization, the plaintiff underwent physical and occupational therapy from July 2004 through November 2004 (Tr. 488-567).

The record shows treatment with a family practice from September 2003 through August 2004 for hypertension, mild degenerative joint disease, gastroesophageal reflux disease and hypercholesterolemia.  Treatment was limited to medication including Tarka, Maxzide and over-the-counter Motrin (Tr. 468-82).

In September 2004, the plaintiff presented to the emergency room with complaints of left shoulder pain.  She indicated that she was catching a dodge ball.  X-rays showed a nondisplaced fracture of the left shoulder (Tr. 483-87).

The plaintiff received treatment from the University Specialty Clinics from August 2004 through April 2005.  At the first visit in August 2004, the plaintiff had inconsistent clinical findings.  For example, the plaintiff reported decreased sensation to light touch but then stated a few minutes later that there was no feeling in the same area.  Reflexes were present when the plaintiff was distracted, but were not present when the plaintiff was watching.  Strength was nearly normal in all extremities.  Although the plaintiff made complaints of difficulty swallowing, a barium swallow test was negative.  During visits at this clinic, the plaintiff typically had a normal musculoskeletal exam, including gait, range

of motion and strength, and was described as alert and orientated.  In February 2005, the plaintiff was started on Voltaren for osteoarthritis.  Previous to this time, the plaintiff had usually been using only over-the-counter Tylenol and Motrin.  Although she complained of off/on numbness/tingling of her arms and legs, she also indicated that it did not limit her activities.  Cervical spine x-rays in February 2005 showed only some minimal loss of the normal lordotic curvature.  Hypertension treatment was limited to occasional adjustments to medication.  The plaintiff's height was recorded as 66 inches, and her weight as 248 pounds (Tr. 568-608).

In July 2005, Dr. Michelle Wilson, the plaintiff's treating doctor from the University Specialty Clinics, completed a medical source statement in which she indicated that the plaintiff had decreased muscle strength in her arms, decreased hand grip and difficulty with ambulation.  She indicated that the plaintiff had diagnoses of hypertension, asthma, obstructive sleep apnea, hypercholesterolemia, osteoarthritis, dysphagia, history of stroke and lumbar back pain.  Dr. Wilson further indicated that the plaintiff was disabled as of July 2004 (Tr. 609-11).

## ANALYSIS

The plaintiff was 41 years old at the time she allegedly became disabled and 44 years old at the time of the ALJ's decision (Tr. 22, 30).  She has a high school education and past relevant work as a cashier, mental health worker, food service aide, work adjustment mental retardation aide, and a childcare worker (Tr. 92, 97, 142).  The plaintiff alleged she became disabled on May 29, 2003, due to a transient ischemic attack ("TIA"), pancreatitis, leg, back, hip, and chest pain, arthritis, knee swelling, and hypertension (Tr. 91).

The ALJ found that the plaintiff had the residual functional capacity ("RFC") to perform a full range of light work and was precluded from performing her past relevant

11

work.  The ALJ noted that the Medical-Vocational Guidelines ("the Grids") directed a finding of not disabled and consequently found the plaintiff was not disabled (Tr. 21-23).

The plaintiff argues that the ALJ erred by (1) failing to give her a fair hearing; (2) failing to find that she had nonexertional impairments and failing to have a vocational expert testify at the hearing; (3) failing to properly explain the residual functional capacity assessment; (4) failing to properly evaluate the opinion of treating physician Dr. Michele Wilson; (5) failing to properly evaluate her pain; and (6) failing to properly evaluate her impairments in combination.

### Fair Hearing

The plaintiff first argues that the ALJ failed to give her a fair hearing. Specifically, she notes the following remarks made by the ALJ in the hearing that indicate the ALJ's bias against her:

> (1)    The ALJ began the hearing by stating that she had some surprises in store for the plaintiff, but that she would not reveal any of these until the decision: "And there were some surprises in it, but they will come out in the decision. I'll not go into it right now . . . . Some really big surprises that I don't think you had read it. You'll see" (Tr. 638).

> (2)    "I am looking at a woman, that is, is giving me like she can't get up, but she's, she doesn't look older than her age, I'll put it that way. No facial wrinkles or so forth like that" (Tr. 643).

> (3)    The ALJ exhibited bias against the plaintiff for being a Medicaid recipient: "You've got a lot of medical evidence . . . so I want to know who was paying the bill" (Tr. 644).

> (4)    The ALJ asked the plaintiff a public policy question as to why, if all of her other bills were paid by Medicaid, Medicaid would not cover her CPAP machine (Tr. 663).

> (5)    "Alright. Now it seems to me a person with a high school education would remember when they had a stroke if it was a stroke. Now you are saying it was May of 2003. Now? You first

12

> said May of 2004 . . . . Counsel I am pressing the issue
> because credibility is a very important part of . . .a case" (Tr.
> 649).

> (6)     The ALJ engaged in a lengthy colloquy about dodgeball
> for six pages of the hearing transcript (Tr. 666-71).

As argued by the plaintiff, if the ALJ had any "surprises" to spring on the plaintiff in her decision, she had a duty to give the plaintiff the opportunity to explain herself in order to prevent any misunderstandings.  The ALJ was also somewhat accusatory in her questions to the plaintiff about her receipt of Medicaid (Tr. 644-46).  When the plaintiff could not remember whether her stroke was in May 2003 or May 2004 and whether she was hospitalized at Lexington Medical Center or Richland Memorial Hospital, the ALJ pressed the issue saying that it went to the credibility (Tr. 649).  Notably, the plaintiff has been hospitalized on several different occasions.

Lastly, when the plaintiff testified that she was injured while watching a dodgeball[2] game by a player who ran into her shoulder while attempting to catch a ball (Tr. 666), the ALJ inexplicably repeatedly accused the plaintiff of *playing* ball rather than watching (Tr. 667, 669).  This court has reviewed the hearing transcript, and the plaintiff consistently testified that she was *watching* the game when she was injured (Tr. 666-71).  Even in her decision, the ALJ erroneously construed this testimony to support a finding that the plaintiff was not credible.  The ALJ stated as follows in the decision:

> In September 2004, the claimant presented to the emergency
> room with complaints of left shoulder pain.  The claimant
> indicated that she was catching a dodge ball.  This activity of
> catching a dodge ball is inconsistent with the claimant's
> allegations of disabling pain and other alleged symptoms.  X-
> rays showed a nondisplaced fracture of the left shoulder.

---

[2]Upon questioning by the ALJ it was clarified that the game was actually kickball rather than dodgeball (Tr. 669).

13

(Tr. 19).   As noted above, the plaintiff's testimony at the hearing was consistent in that she testified she was watching the game when she was injured.  Further, the intake form from the ER at Richland Memorial Hospital states that the plaintiff was hit in the left shoulder "by individual catching a dodge ball" (Tr. 483).

Based upon the foregoing and in view of the errors set forth below, this court recommends that upon remand the hearing should be held before a different ALJ.

### Nonexertional Impairments

The plaintiff next argues that she suffers from both exertional and nonexertional impairments, and thus the ALJ should have obtained vocational expert testimony rather than relying solely on the Grids to satisfy the Commissioner's burden of identifying jobs in the national economy that the plaintiff can perform. *Heckler v. Campbell*, 461 U.S. 458 (1983); *Walker v. Bowen*, 889 F.2d 47 (4th Cir. 1989).  When a claimant suffers from both exertional and nonexertional limitations, the grid tables are not conclusive but may serve as guidelines.  *Wilson v. Heckler*, 743 F.2d 218, 222 (4th Cir. 1984).  The Fourth Circuit has recognized that "not every nonexertional limitation or malady rises to the level of a nonexertional impairment, so as to preclude reliance on the grids." *Walker*, 889 F.2d at 49.  The proper inquiry in such a case is "whether the nonexertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable." *Id.*   If a nonexertional condition reduces an individual's residual functional capacity to perform sedentary work, it is inappropriate to apply the grids.  The question of whether a nonexertional condition interferes with a claimant's residual functional capacity to perform certain jobs is a question of fact.  *Smith v. Schweiker*, 719 F.2d 723 (4th Cir. 1984).

Here, the plaintiff contends that she has nonexertional impairments – specifically, right-sided weakness status post-possible stroke and TIA, dysphagia (difficulty

14

swallowing), chest pain, tingling and numbness of the extremities, and chronic speech problems, that would preclude the use of the Grids. She further argues that to the extent her prior possible stroke had significant psychogenic aspects, the psychological impairment should have been considered (pl. brief 4-11). The defendant argues that the symptoms and impairments resulting from the plaintiff's TIA in May 2003 had resolved and did not rise to the level of nonexertional impairments (def. brief 5-8). However, while the ALJ found that the plaintiff's stroke or TIA symptoms, which included chest pain, weakness, trouble swallowing, headache, and blurry vision, resolved in July 2004, the evidence shows that the symptoms continued after July 2004:

- in August 2004, treatment notes state that the plaintiff had difficulty swallowing solid foods and some liquids (Tr. 607);

- the plaintiff's dysphagia was found to be "not getting better or worse" in September 2004 (Tr. 600);

- in October 2004, the plaintiff still had difficulty swallowing and was receiving speech and occupational therapy (Tr. 596);

- in November 2004, the plaintiff was still receiving occupational and speech therapy (Tr. 591);

- in February 2005, an examining physician found that the plaintiff had numbness and tingling in the upper and lower extremities (Tr. 584);

- in March 2005, a treating physician found that the plaintiff's symptoms "may also be secondary to TIA" and noted that the plaintiff was still receiving occupational and speech therapy and had had three episodes of nausea, light-headedness, blurry vision, right side numbness, and chest pain since her last visit (Tr. 577-78);

- in March 2005, the plaintiff had severe headaches for four days with dizziness and shortness of breath, status post-CVA and TIA (Tr. 573); and

15

> •    in July 2005, Dr. Michelle Wilson stated the plaintiff was disabled "due to her multiple medical problems as well as stroke one year ago" (Tr. 611).  Further, the plaintiff's chronic speech impairment is a non-exertional impairment requiring the testimony of a vocational expert.

Substantial evidence does not support a finding that the plaintiff suffered only from exertional impairments (Tr. 22).  Accordingly, upon remand, the ALJ should be instructed to obtain vocational expert testimony.

### *Residual Functional Capacity Assessment*

The plaintiff next argues that the ALJ erred by failing to properly explain the residual functional capacity ("RFC") assessment.

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work- related activity the individual can perform based on the evidence available in the case record. *The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.* . . .
>
> The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.

SSR 96-8p, 1996 WL 374184, *7 (emphasis added).

The ALJ failed to explain why the plaintiff's well-documented speech impediment, weakness caused by the post-stroke condition, pain, and mental issues were not considered "severe."  The defendant argues that the opinion of Dr. Hegquist, a State consultative examiner, supports the ALJ's assessment.  However, Dr. Hegquist's evaluation

16

of the plaintiff was performed prior to the plaintiff's hospitalization for possible stroke in July 2004. Upon remand, the ALJ should be instructed to explain the RFC findings in accordance with the above-cited ruling.

### Treating Physician

The plaintiff next argues that the ALJ failed to properly consider the opinion of disability provided by treating physician Dr. Wilson. In July 2005, Dr. Wilson, who had treated the plaintiff for a year at the time, completed a medical source statement in which she indicated that the plaintiff had decreased muscle strength in her arms, decreased hand grip and difficulty with ambulation. She indicated that the plaintiff had diagnoses of hypertension, asthma, obstructive sleep apnea, hypercholesterolemia, osteoarthritis, dysphagia, history of stroke and lumbar back pain. Dr. Wilson further indicated that the plaintiff was disabled as of July 2004 (Tr. 609-11).

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment

17

relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion.  20 C.F.R. §404.1527(d)(2)-(5).  Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion.  SSR 96-2p, 1996 WL 374188, *5.  As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* 1996 WL 374188, *4.

In her decision, the ALJ found as follows:

> The opinion of a treating physician is entitled to great weight unless there is persuasive contradictory evidence.  *Coffman v. Bowen*, 829 F.2d 514 (4th Cir. 1987).  However, in this instance, Dr. Wilson's conclusion that the Claimant is disabled is inconsistent with her treatment notes which show limited abnormal findings.  She seems to accept the Claimant's subjective complaints without question, rather than what is recorded in her treatment notes and what is indicated by diagnostic testing.  For these reasons I give little to no weight to her conclusion that the Claimant is disabled.

(Tr. 19).

As argued by the plaintiff, the ALJ's statement that Dr. Wilson "seems to accept the Claimant's subjective complaints without question" is not the sort of analysis contemplated by Social Security Ruling 96-2p (pl. brief 15-16).  Specific examples of

18

objective physical findings by Dr. Wilson and her clinic are cited by the plaintiff in her brief (pl. brief. 16-17), and the ALJ failed to cite evidence contradicting Dr. Wilson's findings. Upon remand, the ALJ should be directed to specifically address the weight given to Dr. Wilson's opinion, to provide an explanation of the specific evidence contradicting the opinion, and to consider the evidence supporting the opinion.

***Pain***

The plaintiff next argues that the ALJ erred in failing to follow binding law in the evaluation of her pain and other subjective complaints.

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Furthermore, it "must be sufficiently specific to make clear

19

to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4.

In addition to the objective medical evidence, the factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)     the individual's daily activities;

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The ALJ found as follows:

The claimant has alleged symptoms including back and hip pain, chest pain, carpal tunnel syndrome symptoms and anxiety. The claimant has taken medications including Tarka, Maxzide, Voltaren, and over-the-counter Motrin and Tylenol. At one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in the claimant's testimony), the claimant has reported the following daily activities: independence with self-care, preparing food, reading, watching television, walking around outside the house, some cleaning, some grocery shopping, receiving visitors and attending church on a weekly basis.

20

> The claimant has symptoms which may interfere with performance of some work activities. However, when considering the objective medical evidence, including clinical findings and diagnostic testing, as well as the factors discussed above, the claimant is able to perform a variety of work activities.

(Tr. 21).

As argued by the plaintiff, the ALJ did not fulfill the two-part test for evaluation of pain and other subjective complaints. The ALJ never stated whether or not the plaintiff has a condition that would produce the symptoms of which she complains, nor did she conduct the proper analysis. Further, the ALJ did not explain her findings as required by Social Security Ruling 96-7p. The plaintiff cites a few of the plaintiff's daily activities in support of her finding. Clearly, a claimant is not required to be bedridden or completely helpless in order to be found to be disabled. *Totten v. Califano*, 624 F.2d 10, 11-12 (4th Cir. 1980). The ALJ may consider these activities of daily living, but must do so within the context of complying with the requirements set out under the above-cited law. Upon remand, the ALJ should be instructed to evaluate the plaintiff's subjective complaints as set forth above.

### Combination of Impairments

Lastly, the plaintiff argues that the ALJ erred in considering each of her impairments piecemeal, rather than in combination. In a disability case, the combined effect of all the claimant's impairments must be considered without regard to whether any such impairment if considered separately would be sufficiently disabling. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but

21

considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). Upon remand, the ALJ should be instructed to consider the limitations and restrictions imposed by all of the plaintiff's impairments, including those that are not severe, in assessing the plaintiff's residual functional capacity. *See* SSR 96-8p, 1996 WL 374184, *5.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/William M. Catoe
United States Magistrate Judge

January 8, 2007

Greenville, South Carolina

22